IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI

| | | |
|---|---|---|
| MAXRELIEF USA, INC., | : | Case No. 1:21-cv-755 |
| Plaintiff, | : | Judge Matthew W. McFarland |
| v. | : | |
| JOHN O'MALEY d/b/a JOHN O'MALEY AND ASSOCIATES | : | |
| Defendant. | : | |

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. 53). Plaintiff filed a Response in Opposition (Doc. 55), to which Defendant filed a Reply in Support (Doc. 57). Thus, this matter is ripe for the Court's review. For the reasons below, Defendant's Motion for Summary Judgment (Doc. 53) is **GRANTED**.

### FACTS AND PROCEDURAL HISTORY

This case arises from a contract dispute between Plaintiff MaxRelief USA, Inc. and Defendant John O'Maley, doing business as John O'Maley and Associates. (Compl., Doc. 1, ¶ 8.) MaxRelief manufactures and distributes topical pain relief products for muscle or joint pain. (*Id.* at ¶ 1.) MaxRelief is a Delaware corporation with its principal place of business in San Francisco, California. (*Id.*) MaxRelief is owned by Peter Spoto, who also serves as the Chief Executive Officer. (Spoto Decl., Doc. 55-2, Pg. ID 485; Spoto Dep., Doc. 54-1, Pg. ID 431.) John O'Maley and Associates is a national sales and marketing

consultant business owned by John O'Maley. (O'Maley Decl., Doc. 53-3, Pg. ID 407.) O'Maley operates his business in his home state of Ohio. (*Id.*)

On April 21, 2016, Spoto contracted with O'Maley for O'Maley to help launch two MaxRelief products—MaxRelief pain medication and Lil' Giggles. (Contract, Doc. 53-3, Pg. ID 410-11; Spoto Dep., Doc. 54-1, Pg. ID 429-30.) O'Maley negotiated, executed, and allegedly performed the Contract in Ohio. (O'Maley Decl., Doc. 53-3, Pg. ID 407.) Under the Contract, O'Maley agreed to "hire, train [and] manage sales agencies for distribution of [MaxRelief] product." (Contract, Doc. 53-3, Pg. ID 410.) O'Maley acted as a "master broker" under the Contract, as he was responsible for managing other brokers selling MaxRelief products. (Spoto Decl., Doc. 55-2, Pg. ID 485.) The Contract did not guarantee that O'Maley's efforts would translate to a successful launch of MaxRelief's products. (Spoto Dep., Doc. 54-1, Pg. ID 433.)

The parties agreed to a payment structure for the sales agencies: "[MaxRelief] shall compensate sales agencies 5% commission on net sales [and O'Maley] will not be responsible for payment." (Contract, Doc. 53-3, Pg. ID 410.) The Contract also specified compensation for O'Maley. In return for O'Maley's services, MaxRelief agreed to pay him $2,000 on or before May 15, 2016, $2,000 on or before June 15, 2016, $7,000 each month from July 15 through September 15 of 2016, and $5,000 each month after September 15, 2016. (*Id.*) MaxRelief also agreed to pay O'Maley 4% commission on net sales. (*Id.*)

The parties dispute whether O'Maley hired, trained, and managed sales agencies. (Response, Doc. 55-1, Pg. ID 482.) The record includes declarations from three sales agencies relevant to this dispute. Frank Parise, President of Performance Sales &

Marketing, declared that "Mr. O'Maley hired and trained me and Performance Sales & Marketing on the products that MaxRelief sells." (Parise Decl., Doc. 53-5, Pg. ID 419.) Next, Paul Wendling, the sole proprietor of North Coast Sales & Marketing, declared that "O'Maley contacted me to sell MaxRelief products, informed me about their products, shared presentations and shared information he received at trade shows so I could follow up with accounts." (Wendling Decl., Doc. 53-6, Pg. ID 421.) Lastly, Thomas Goforth, who previously worked for the brokerage firm Arena Inc., had a professional relationship with O'Maley for several years. (Goforth Decl., Doc. 53-4, Pg. ID 415.) Goforth attached a letter to his declaration that describes his training and work with O'Maley to launch MaxRelief products. (*Id.*) The letter describes that O'Maley prepared Goforth to present MaxRelief products to Walmart and recounts how Walmart responded to Goforth's multiple contacts with them about the products. (*Id.* at Pg. ID 417.)

Spoto does not dispute that O'Maley engaged with "commission-only brokers who only get paid if they sell." (Spoto Decl., Doc. 55-2, Pg. ID 486.) Rather, Spoto declares that a commission-only arrangement does not constitute "hiring" within the brokerage and distribution industry for personal care products. (*Id.*) According to Spoto, "[a] 'hiring' is consummated when a master broker pays a broker to distribute its product." (*Id.*)

On March 12, 2021, MaxRelief filed the present action in the United States District Court for the Northern District of Texas. (*See* Complaint, Doc. 1.) The case was transferred to this Court on December 6, 2021. (*See* Transfer, Doc. 27.) MaxRelief brings three causes of action. First, under a breach of contract claim, MaxRelief alleges that O'Maley failed to

3

adequately hire, train, and manage sales agencies as set forth in the Contract. (Complaint, Doc. 1, ¶ 16.) Second, under a Texas deceptive trade practices law claim, MaxRelief alleges that O'Maley "made false, misleading, and deceptive statements to MaxRelief that he was taking the necessary effort to hire, train, and manage certain sales agencies to sell the MaxRelief products and that the MaxRelief products were well-received by distributors." (*Id.* at ¶ 23.) Third, under an unjust enrichment claim, MaxRelief alleges that O'Maley was unjustly enriched by retaining $60,000 in compensation while not performing under the Contract. (*Id.* at ¶ 29.)

## LAW

Courts must grant summary judgment if the record "reveals that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing Fed. R. Civ. P. 56(c)). Once the movant has met its initial burden of showing that no genuine issue of material fact remains, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To do so, the nonmovant must present "significant probative evidence . . . on which a reasonable jury could return a verdict" in their favor. *Chappell v. City of Cleveland*, 585 F.3d 901, 913 (6th Cir. 2009) (citation omitted).

The court must view "the facts and any inferences that can be drawn from those facts . . . in the light most favorable to the nonmoving party." *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005). This requirement, however, does not mean that the Court must find a factual dispute where record evidence contradicts unsupported

4

allegations. "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (citation omitted). "If the moving party fulfills its burden of demonstrating that no genuine issue of material fact exists, the nonmoving party, to receive a trial, must present some significant probative evidence creating a factual issue." *Stratienko v. Cordis Corp.*, 429 F.3d 592, 597 (6th Cir. 2005).

## ANALYSIS

O'Maley moves for summary judgment on all counts, arguing that there is no genuine issue of material fact that O'Maley (1) did not breach the Contract, (2) did not make any false, misleading, or deceptive statements, and (3) was not unjustly enriched. (Summary Judgment, Doc. 53, Pg. ID 391.) The Court will consider each argument in turn.

### I. Breach of Contract Claim

O'Maley first argues that he is entitled to summary judgment on MaxRelief's breach of contract claim. To succeed on a breach of contract claim under applicable Ohio law,[1] the plaintiff must show that "(1) a contract existed, (2) one party fulfilled his obligations, (3) the other party failed to fulfill his obligations, and (4) damages resulted from that failure." *Blake Homes, Ltd. v. FirstEnergy Corp.*, 877 N.E.2d 1041, 1052 (Ohio Ct. App. Sept. 7, 2007) (citation omitted). Here, only the third element is disputed. MaxRelief

---

[1] The Contract does not specify what substantive law applies. Thus, the Court turns to Ohio's choice of law rules, which "require a court to apply the law of the state with the most significant relationship to the contract." *Int'l Ins. Co. v. Stonewall Ins. Co.*, 86 F.3d 601, 604 (6th Cir. 1996). Because O'Maley allegedly performed the Contract in Ohio and resides in Ohio, the Court applies Ohio law. (O'Maley Decl., Doc. 53-3, Pg. ID 407; Compl., Doc. 1, ¶ 2.)

5

alleges that O'Maley failed to adequately hire, train, and manage sales agencies under the Contract. (Compl., Doc. 1, ¶ 16.)

O'Maley maintains that there is no genuine dispute that O'Maley hired sales agencies. As support, O'Maley points to the declarations from three brokers. Frank Parise—the President of Performance Sales & Marketing—declared that "Mr. O'Maley hired and trained me and Performance Sales & Marketing on the products that MaxRelief sells." (Parise Decl., Doc. 53-5, Pg. ID 419.) Similarly, Paul Wendling—the sole proprietor of North Coast Sales & Marketing—declared that "O'Maley contacted me to sell MaxRelief products, informed me about their products, shared presentations and shared information he received at trade shows so I could follow up with accounts." (Wendling Decl., Doc. 53-6, Pg. ID 421.) Thomas Goforth—who previously worked for the brokerage firm Arena Inc.—attached a letter to his declaration that describes how O'Maley prepared Goforth to present MaxRelief products to Walmart and recounts how Walmart responded to Goforth's multiple contacts concerning the products. (Goforth Decl., Doc. 53-4, Pg. ID 415, 417.) Considering the collection of declarations, O'Maley easily meets his initial burden of demonstrating that there is no genuine issue of dispute that he hired, trained, and managed sales agencies for distribution of MaxRelief products.

Because O'Maley met his burden, the burden shifts to MaxRelief to "present some significant probative evidence creating a factual issue." *Stratienko v. Cordis Corp.*, 429 F.3d 592, 597 (6th Cir. 2005). MaxRelief points to Spoto's declaration, in which he asserts that O'Maley never hired brokers. (Spoto Decl., Doc. 55-2, Pg. ID 486.) Spoto states that O'Maley "engage[d] with commission-only brokers who only get paid if they sell." (*Id.*)

6

This is problematic, in Spoto's estimation, because a "commission-only arrangement is not considered 'hiring' by the brokerage/distribution industry for personal care products." (*Id.*) In response, O'Maley contends that the contractual term "hire" includes commission-based brokers.

Thus, the operative question here is how to interpret the word "hire" within the Contract. As the Sixth Circuit has explained, "disputed issues of contractual interpretation can be resolved at summary judgment on the basis that they are questions of law." *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 595 (6th Cir. 2001) (emphasis omitted). "In a contract dispute, summary judgment is permissible when the contractual language of the contract is unambiguous, or, if the language is ambiguous, where extrinsic evidence leaves no genuine issue of material fact and permits contract interpretation of the agreement as a matter of law." *Klopfenstein v. Fifth Third Bank*, No. 1:12-CV-851, 2023 WL 3250622, at *3 (S.D. Ohio Mar. 29, 2023) (quotation omitted). A contract is ambiguous only if "its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." *EnQuip Techs. Grp. v. Tycon Technoglass*, 986 N.E.2d 469, 475 (Ohio Ct. App. Dec. 28, 2012) (quotations omitted). Courts construe contractual terms within the broader context of surrounding contractual language. *Id.*

The Court begins with the contractual language in question. O'Maley agreed to "hire, train [and] manage sales agencies for distribution of [MaxRelief] product." (Contract, Doc. 53-3, Pg. ID 410.) The term "hire" is undefined in the Contract. "[C]ommon, undefined words appearing in a written instrument 'will be given their

ordinary meaning unless manifest absurdity results, or some other meaning is clearly evidenced from the face or overall contents of the instrument.'" *State ex rel. Petro v. R.J. Reynolds Tobacco Co.*, 820 N.E.2d 910, 915 (Ohio Ct. App. Dec. 30, 2004) (quoting *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 150 (Ohio 1978)).

Within context, the Court finds the term "hire" to unambiguously include commission-based hiring. Perhaps most tellingly, the sentence immediately following the "hiring" language reads, "[MaxRelief] shall compensate sales agencies 5% commission on net sales [and O'Maley] will not be responsible for payment." (Contract, Doc. 53-3, Pg. ID 410.) In other words, the parties explicitly agreed that the sales agencies hired by O'Maley would receive commissions from MaxRelief—not payment from O'Maley. Therefore, concluding that "hire" excludes commission-based hiring would contradict the plain language of the Contract.

The Court's conclusion would remain unchanged even without this compensation language. Courts traditionally turn to dictionaries to determine the plain meaning of undefined terms in a contract. *Vandercar, LLC v. Port of Greater Cincinnati Dev. Auth.*, 196 N.E.3d 878, 886 (Ohio Ct. App. Sept. 9, 2022). The Merriam-Webster dictionary defines the verb "hire" as (1) to engage the personal services of for a set sum; (2) to engage the temporary use of for a fixed sum; (3) to grant the personal services of or temporary use of for a fixed sum; or (4) to get done for pay. *Hire*, Merriam-Webster Dictionary, Merriam-webster.com, https://www.merriam-webster.com/dictionary/hire (last visited Nov. 29, 2023). Given these expansive definitions, personal services in exchange for fixed commission-based pay comfortably falls within the plain meaning of "hire."

8

Nevertheless, MaxRelief maintains that "hire" has a special meaning within the brokerage and distribution industry for personal care products. (Response, Doc. 55, Pg. ID 477; Spoto Decl., Doc. 55-2, Pg. ID 486.) But courts only consider evidence of trade usage within an industry to ascertain the meaning of an ambiguous term. *Maverick Oil & Gas, Inc. v. Barberton City Sch. Dist. Bd. of Edn.*, 872 N.E.2d 322, 328 (Ohio Ct. App. Apr. 11, 2007). "It is well-settled that although extrinsic evidence of a general custom or trade usage cannot vary the terms of an express contract, such evidence is permissible to show that the parties to a written agreement employed terms having a special meaning within a certain geographic location or a particular trade or industry, not reflected on the face of the agreement." *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 151 (Ohio 1978).

Because the term "hire" unambiguously includes commission-based hiring, potential trade usage of the term is beyond the scope of this Court's inquiry. Spoto's assertion that O'Maley engaged with commission-only brokers paid after the fact fails to demonstrate that O'Maley breached the Contract by not hiring sales agencies. In fact, this precise arrangement appears to have been contemplated by the parties through the payment structure detailed in the Contract. Thus, the Court is unpersuaded by MaxRelief's argument and finds that there is no genuine dispute that O'Maley hired sales agencies in accordance with the Contract.[2] O'Maley is entitled to summary judgment on MaxRelief's breach of contract claim.

---

[2] MaxRelief also contends that it suffered at least $60,000 in damages from the alleged breach of contract. (Response, Doc. 55-1, Pg. ID 483.) In contrast, O'Maley argues that MaxRelief can only recover up to $45,000. (Reply, Doc. 57, Pg. ID 493.) Because O'Maley is entitled to summary judgment on the breach of contract claim, this dispute is moot.

## II. Deceptive Trade Practices and Unjust Enrichment Claims

O'Maley also argues that summary judgment is appropriate as to the deceptive trade practices and unjust enrichment claims. (*See* Summary Judgment, Doc. 53-1, Pg. ID 396-400.) MaxRelief fails to address O'Maley's arguments—let alone even mention the claims themselves—in its response. (*See* Response, Doc. 55.) Sixth Circuit precedent is clear: "a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (collecting cases); *see also Southward v. FedEx Freight, Inc.*, 98 F. Supp. 3d 926, 933 (S.D. Ohio 2014) (granting summary judgment because nonmoving party failed to make an argument in opposition). MaxRelief has therefore abandoned its deceptive trade practices and unjust enrichment claims, and O'Maley is entitled to summary judgment on each claim as a matter of law.

## CONCLUSION

For the reasons above, the Court **GRANTS** Defendant's Motion for Summary Judgment (Doc. 53). This case shall be **TERMINATED** from the Court's docket.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: *Matthew W. McFarland*

JUDGE MATTHEW W. McFARLAND